UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

MFS FUND DISTRIBUTORS, INC.,                    )
MFS SERIES TRUST II, on behalf of its series    )
MFS EMERGING GROWTH FUND,                        )
MASSACHUSETTS INVESTORS TRUST, and              )
MASSACHUSETTS FINANCIAL SERVICES                )
COMPANY,                                         )
                                                 )
                                                 )
            Plaintiffs,                          )        Civil Action No. 1:05-cv-11520 EFH
                                                 )
      v.                                         )
                                                 )
KAPLAN & CO. SECURITIES, INC.,                   )
                                                 )
            Defendant.                           )
_____          )

## AMENDED COMPLAINT

### INTRODUCTION

1.      This is an action for damages and equitable relief for violations of §10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, fraud and

misrepresentation, breach of contract, deceptive practices in violation of Massachusetts General

Laws ch. 93A, conversion, unjust enrichment, and fraud in violation of the Massachusetts

Uniform Securities Act, all arising out of late trading by Kaplan & Co. Securities, Inc. in the

shares of the Plaintiff mutual funds.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over the federal law claims under 28 U.S.C. § 1331.

This Court has jurisdiction over the state law claims based on diversity of citizenship under 28

U.S.C. § 1332(a) because the Plaintiffs and Defendant are citizens of different States and the

amount in controversy exceeds $75,000.  In addition, even if diversity jurisdiction were lacking, the Court would have supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the defendant is a corporation that is subject to personal jurisdiction in the District of Massachusetts and therefore is deemed to reside in the District of Massachusetts, because the defendant transacts business in Massachusetts, because a substantial portion of the events or omissions giving rise to the claims at issue occurred in the District of Massachusetts, and because a substantial part of the property that is the subject of the action is situated in the District of Massachusetts.

## PARTIES

4.      Plaintiffs MFS Series Trust II, on behalf of its series MFS Emerging Growth Fund, and Massachusetts Investors Trust (collectively, the "Funds") are open-end investment companies registered under the Investment Company Act of 1940 (the "Investment Company Act") and organized under the laws of Massachusetts, with their principal place of business in Boston, Massachusetts.

5.      Plaintiff MFS Fund Distributors, Inc. ("MFS Fund Distributors") is a corporation organized under the laws of Delaware, with its principal place of business in Boston, Massachusetts.  MFS Fund Distributors is engaged in the business of wholesale distribution of shares in the Funds to broker-dealers across the country for retail sale to their customers.

6.      Plaintiff Massachusetts Financial Services Company ("MFS") is a corporation organized under the laws of Delaware with its principal place of business in Boston,

Massachusetts. MFS serves as the investment adviser to the Funds, and is the parent company of MFS Fund Distributors.

7.      Kaplan & Co. Securities, Inc. ("Kaplan") is a Florida corporation with its principal place of business in Boca Raton, Florida.

8.      During the period relevant to this Complaint, Lawrence S. Powell ("Powell") was a registered representative associated with Kaplan.

9.      During the period relevant to this Complaint, Delano N. Sta.Ana ("Sta.Ana") was a registered representative associated with Kaplan.

10.     During the period relevant to this Complaint and currently, Kaplan was and is registered as a broker-dealer with (a) the Securities and Exchange Commission ("SEC") under the Exchange Act, and (b) the Commonwealth of Massachusetts.

11.     Kaplan is a member of the Boston Stock Exchange.

## TRADING IN MUTUAL FUNDS

12.     Open-end investment companies registered under the Investment Company Act are generally called mutual funds. A mutual fund is a company or a trust through which many investors pool their monies for collective investment, primarily in securities such as stocks or bonds. Each investor in a mutual fund owns shares of that fund, which represent a partial undivided ownership interest in the fund's portfolio of investments. Mutual funds issue new shares to investors, and those shares are "redeemable securities" under the Investment Company Act, which generally means that the fund must redeem the shares upon presentment and pay to the investor approximately the investor's proportionate share of the fund's net assets.

3

13.     Under § 22(d) of the Investment Company Act, shares in a mutual fund must be sold at a uniform public offering price described in the fund's prospectus.  Under what is known as the "forward pricing" rule, Rule 22c-1 under the Investment Company Act, shares in a mutual fund must be sold to investors and redeemed at a price reflecting the net asset value per share ("NAV") of the fund that is next computed after receipt of an order to buy or sell the shares.

14.     Rule 22c-1 and § 22(d) apply to mutual funds, their principal underwriters, and dealers in mutual fund shares.

15.     The Funds, like most mutual funds, compute their NAV once each business day (*i.e.*, a day on which the New York Stock Exchange ("NYSE") is open for trading) as of the close of regular trading on the NYSE, which is 4:00 p.m. Eastern time (the "Valuation Time").  Thus, if a customer places an order to purchase or sell shares in one of the Funds before the Valuation Time on a given business day, the price of those shares will be determined based on that Fund's NAV computed as of the Valuation Time that day.  If the customer places the order after the Valuation Time, then the price of the shares will be determined based on that Fund's NAV as of the Valuation Time on the next business day.

16.     For fund shares bought or sold through a broker-dealer, the price that a customer receives is governed by the time that the customer submits the order to the broker-dealer, not the time at which the broker-dealer transmits the order to the Fund, the Fund's transfer agent or a clearing agency.  Thus, an order placed with a broker-dealer before the Valuation Time must receive that day's price even if the broker-dealer does not transmit the order to the Fund, the Fund's transfer agent or a clearing agency until some time after the Valuation Time.

Correspondingly, an order placed with a broker-dealer after the Valuation Time must receive the price set the following business day.

17.    The SEC recently stated:  "Rule 22c-1 currently deems a purchase or redemption order to be received, for purposes of determining the appropriate day's price, when the retail dealer receives the order, even if it is actually submitted to the fund's transfer agent at a later time."  Rel. No. IC-26288 (Dec. 11, 2003).

18.    At all times relevant to this Complaint, the prospectuses for each of the Funds explained the manner in which the shares of the Funds are priced.  For example, during the period relevant to this Complaint, the prospectus for the MFS Emerging Growth Fund stated:

> "The price of each class of the fund's shares is based on its net asset value.  The net asset value of each class of shares is determined once each day during which the New York Stock Exchange (the 'NYSE') is open for trading as of the close of regular trading on the NYSE (generally 4:00 p.m. Eastern time) (referred to as the valuation time).  The New York Stock Exchange is closed on most national holidays and Good Friday.  To determine net asset value, the fund values its assets at current market values, or at fair value as determined by the adviser under the direction of the Board of Trustees that oversees the fund if the trustees determine that the current market price does not constitute fair value. . . ."

> "You will receive the net asset value next calculated, after the deduction of applicable sales charges and any required tax withholding, if your order is complete (has all required information) and MFSC [*i.e.*, the transfer agent for the Funds] receives your order by:

> - The valuation time, if placed directly by you (not through a financial adviser such as a broker or bank) to MFSC; or

> - MFSC's close of business, if placed through a financial adviser, **so long as the financial adviser (or its authorized designee) received your order by the valuation time**."  (Emphasis added.)

Similar statements appeared in the prospectuses for the other Funds.

## LATE TRADING IN MUTUAL FUNDS

19.     "Late trading" is the illegal practice whereby an order to purchase or sell mutual

fund shares that in fact is submitted after the time at which the fund's NAV is computed is made

to appear eligible for and receives the NAV computed as of that earlier time.  An investor who

engages in this practice is therefore not buying and selling shares in the fund at the current public

offering price, but rather at the previous day's public offering price (*i.e.*, the price based on the

fund's NAV calculated before the order is placed), in violation of Rule 22c-1 under the

Investment Company Act.

20.     Investors who engage in late trading in a mutual fund may reap significant profits,

because they are able to take advantage of information about developments in financial markets

that occur after 4:00 p.m. that are likely to affect the fund's NAV when it is next computed.

Hence in a rising market the late trader, whose purchase order should be filled at the higher NAV

calculated at 4:00 p.m. on the following day, instead gets the benefit of the lower NAV calculated

before his order was placed.  Similarly, in a falling market, the late trader's sell order gets the

benefit of the higher NAV calculated before his order was placed, when it should be filled at the

lower NAV calculated at 4:00 p.m. the following day.

21.     In effect, a late trader is able to purchase fund shares at a price that is lower than

the public offering price, thereby receiving more shares than he is entitled to, or to sell fund shares

at a price that is higher than the public offering price, thereby receiving more cash than he is

entitled to.

22.     The SEC has recently described late trading as follows:

> "'Late trading' refers to the illegal practice of permitting a purchase or redemption
> order received after the 4 p.m. pricing time to receive the share price calculated as
> of 4 p.m. that day.  A late trader can exploit events occurring after 4 p.m., such as

earnings announcements, by buying on good news (and thus obtaining fund shares too cheaply) or selling on bad news (and thus selling at a higher price than the shares are worth)."  Rel. No. IC-26288 (Dec. 11, 2003).

## THE DEALER AGREEMENT

23.    On October 26, 1996, MFS Fund Distributors entered into a Dealer Agreement with Kaplan.

24.    Under the Dealer Agreement, MFS Fund Distributors offered to sell shares in the Funds to Kaplan at the public offering price determined in accordance with the prospectuses for each of the Funds.  Kaplan agreed that it would only purchase and sell shares in the Funds at that public offering price.

25.    Under the Dealer Agreement, Kaplan agreed to act as a dealer in shares of the Funds.  Among other things, the Dealer Agreement states:  "In all sales of the Shares to the public, you [*i.e.*, Kaplan] shall act as dealer for your own account."

26.    Section 22(d) of the Investment Company Act and Rule 22c-1 thereunder apply to Kaplan's actions under the Dealer Agreement.

27.    Under the Dealer Agreement, Kaplan further represented that it had complied and would continue to comply with all applicable securities, tax, and other laws related to the offer and sale of shares in the Funds.

28.    Under the Dealer Agreement, Kaplan also agreed that it would indemnify and hold harmless MFS Fund Distributors, the Funds, and their affiliates from and against any claims, losses, costs or liabilities, including attorney's fees, that may be assessed against, or suffered or incurred by any of them, howsoever they arise and as they are incurred, which relate in any way to

any breach of Kaplan's representations or warranties or failure to comply with its obligations set forth in the Dealer Agreement.

29.    The Dealer Agreement states that it is governed by Massachusetts law.

30.    The Dealer Agreement states that "Shares [of the Funds] sold by us to you hereunder shall be available to you for delivery against payment at the office of our agent, MFS Service Center, Inc., 500 Boylston Street, Boston, Massachusetts 02116, unless other arrangements are made with us for delivery and payment."


## KAPLAN'S LATE TRADING

31.    Upon information and belief, Kaplan engaged in frequent late trading in the Funds between January 2002 and October 2003 (the "Late Trading Period").

32.    On January 11, 2005, New York State Attorney General Eliot Spitzer issued a press release (the "Spitzer Press Release") announcing that "two executives" of Kaplan had "pleaded guilty to state criminal charges in connection with … [an] investigation of illegal trading practices in the mutual fund industry."

33.    The Spitzer Press Release further stated that "two employees of Kaplan & Company Securities engaged in illegal late trading of mutual funds on behalf of Kaplan and specific hedge fund clients."  The Spitzer Release identified the two employees as Powell and Sta.Ana, the two registered representatives associated with Kaplan during the period relevant to this Complaint.

34.    Also on January 11, 2005, the SEC issued an order finding that Powell and Sta.Ana "willfully aided and abetted and caused Kaplan & Co.'s violations of Section 15(c)(1) of

the Exchange Act" and "Rule 22c-1 promulgated under Section 22(c) of the Investment Company Act."

35.     The SEC found that Powell and Sta.Ana had engaged in late trading "[f]rom 2000 through approximately September 2003" on behalf of Kaplan customers by "effect[ing] mutual fund trades for orders they received after 4:00 p.m. ET, allowing their customers to receive the same-day net asset value ('NAV') pricing on those trades (as though the orders were received prior to the close of the stock market at 4:00 p.m. ET, the time as of which the funds calculated their NAV)." According to the SEC, this system allowed Kaplan's customers "to capitalize on news events or market changes occurring after the 4:00 p.m. ET close of the stock market.

36.     Kaplan engaged in late trading in certain mutual funds affiliated with MFS, including the Plaintiff Funds.

37.     The SEC also found that Powell and Sta.Ana engaged in "next-day busting" of orders, through which, as members of Kaplan's mutual fund group, Powell and Sta.Ana "effected trades for customers and then contacted the clearing firm the following morning to take steps to cancel or 'bust' the trade." According to the SEC, "[i]n some instances, … Kaplan's mutual fund group falsely told the clearing firm that the order had been 'erroneously entered,' when in fact, the [] customer had simply changed its mind about placing the order."

38.     According to the SEC order, Powell and Sta.Ana used multiple clearing brokers to process their mutual fund trades on behalf of Kaplan's customers.

39.     On information and belief, during the Late Trading Period, Kaplan transmitted orders to one or more clearing brokers to purchase or sell shares in the Funds. The clearing brokers would then submit Kaplan's orders using Fund/SERV, a central processing system

maintained by the National Securities Clearing Corporation ("NSCC") that collects and sorts order information and transmits it to the Funds' transfer agent.

40.    Upon information and belief, on numerous occasions during the Late Trading Period Kaplan transmitted orders to buy and sell shares in the Funds to the clearing brokers after the Valuation Time, and/or were able to make a final decision after the Valuation Time whether to cancel a previously-submitted order, while falsely representing to the Plaintiffs that the order to purchase or sell the shares, and the decision whether to keep or cancel the order, had been made before the Valuation Time.

41.    Kaplan concealed its late trading from plaintiffs by not disclosing to plaintiffs that it was either receiving customer orders or making investment decisions after the Valuation Time.

42.    On days with unusual volatility in the futures market after the Valuation Time, Kaplan often submitted trades that took advantage of large movements in the S&P futures market.

  a.    For example, after the close on June 6, 2002, Intel announced lower than expected second quarter earnings.  After the Valuation Time, S&P futures declined 1.31% – the largest after-hours decline of the year.  That day, Kaplan submitted an MFS fund redemption order totaling close to $17 million.

  b.    Similarly, on October 15, 2002, Intel reported third quarter earnings below expectations.  S&P futures declined 0.78% after hours – the third largest after-hours decline of the year.  Kaplan submitted a redemption order totaling over $19 million.

43.    In late 2003 and early 2004, Plaintiffs performed an analysis of trading activity in the Funds to determine whether profits from trades in the Funds in particular accounts were likely

attributable to late trading. The analysis was designed to test whether there was a positive correlation between the dollar net flow on a daily basis for the particular accounts and the return on Standard & Poors ("S&P") stock market futures.

44.     This regression analysis showed a highly statistically significant correlation between Kaplan's trading activity in the Funds and the return on S&P futures from 4:15 p.m. to 9 p.m. The probability of finding such a strong correlation between Defendants' trading activity and the S&P futures from this time period in the absence of late trading would be less than 1 in 1000. These results provide strong evidence that Kaplan was engaged in late trading in the Funds.

45.     Upon information and belief, based on the facts as set forth above, many of Kaplan's orders to purchase and sell shares in the Funds during the Late Trading Period that were reported as having been placed before the Valuation Time were in fact placed after the Valuation Time, and thus constituted late trading.

46.     Upon information and belief, based on the foregoing regression analysis and the Funds' records, (i) Kaplan made illegal profits through late trading at the expense of the Funds and (ii) the Funds have suffered damages because their net assets were illegally diminished.

47.     Plaintiffs were not aware of and could not reasonably have discovered Kaplan's late trading at the time those orders were placed. Plaintiffs first obtained specific evidence of Kaplan's late trading at the end of 2003, when they obtained the initial results of the regression analysis of trading in the Funds.

## LEGAL PROCEEDINGS AGAINST THE PLAINTIFFS

48.     On February 5, 2004, in accordance with a settlement agreement entered into by MFS, the SEC issued an administrative order finding that MFS had improperly allowed investors to engage in market timing and failed to detect late trading by a number of market timers.  MFS consented to the entry of the SEC order without admitting or denying the findings.

49.     The SEC order required MFS to disgorge $175 million and to pay a $50 million penalty.   The SEC order establishes a mechanism to distribute the disgorgement and fine to MFS-advised funds and their shareholders.

50.     MFS would have had to pay substantially less than $175 million in disgorgement if Kaplan had not engaged in late trading in the Funds.

51.     MFS incurred substantial attorneys' fees and other costs in connection with the SEC's investigation.  These expenses are also attributable, at least in part, to Kaplan's late trading.

52.     In addition to the SEC investigation, Plaintiffs have been named as defendants in numerous civil lawsuits that also arise out of Kaplan's late trading activities.  Plaintiffs have incurred, and will continue to incur, substantial attorneys' fees in connection with those cases, and may ultimately be required to pay judgments or settlements in those cases.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 10(b) OF EXCHANGE ACT AND RULE 10b-5**
**(Funds and MFS Fund Distributors)**

53.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 52, above.

54.     Kaplan's illegal late trading in the Funds, as outlined in the preceding paragraphs, constituted a device, scheme, or artifice to defraud the Funds.

55.     Kaplan made numerous untrue statements of material fact or omitted to state facts necessary under the circumstances to make their statements not misleading.

    a.     As set forth above, Kaplan falsely stated on numerous occasions that orders to purchase or sell shares in the Funds which were transmitted after the Valuation Time had been placed before the Valuation Time.  In fact, no final orders had been placed at that time.

    b.     On each of these occasions, Kaplan omitted to state that it was engaged in a pattern of illegal late trading in order to defraud the Funds and gain an unfair advantage over other investors.

    c.     In entering into the Dealer Agreement, Kaplan falsely represented that it would comply with all applicable securities laws and that Kaplan would only purchase or sell shares in the Funds at the public offering price determined in accordance with the prospectuses for the Funds.

56.     The foregoing conduct by Kaplan constituted an act, practice or course of business that operated as a fraud upon the Funds.

57.    Kaplan employed the foregoing device, artifice or scheme to defraud, made the false or materially misleading foregoing statements, and engaged in the foregoing acts, practices, or course of business by use of the mails and various means and instrumentalities of interstate commerce, including but not limited to interstate wires.  Specifically, Kaplan used the interstate wires to transmit orders to purchase and sell shares in the Funds from Kaplan's office in Florida to multiple clearing brokers located in, among other places and on information and belief, New York.  Kaplan also transmitted the false representations in the Dealer Agreement by use of the mails.

58.    Kaplan employed the foregoing device, artifice or scheme to defraud, made the foregoing false or materially misleading statements, and engaged in the foregoing acts, practices, or course of business in connection with the purchase and sale of shares in the Funds.  The Funds were the sellers of all shares purchased by Kaplan, and the purchaser of all shares sold by Kaplan, and MFS Fund Distributors acted as distributor with respect to all such sales and purchases of Fund shares.

59.    Kaplan employed the foregoing device, artifice or scheme to defraud, made the foregoing false or materially misleading statements, and engaged in the foregoing acts, practices, or course of business, with the specific intent to defraud the Funds and their investors. Specifically, Kaplan intended to earn a profit either by purchasing for its own account shares in the Funds for less than their public offering price and selling shares for more than their public offering price, or for facilitating such purchases and sales for the accounts of its customers, from whom Kaplan earned commissions and other fees.

60.     By employing the foregoing device, artifice or scheme to defraud, making the foregoing false or materially misleading statements, and engaging in the foregoing acts, practices, or course of business, in connection with the purchase or sale of shares in the Funds, Kaplan violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

61.     In selling shares to Kaplan, the Funds and MFS Fund Distributors relied on Kaplan's representation that it had complied and would continue to comply with all applicable federal securities law, and that it would only purchase or sell shares in the Funds at the public offering price determined in accordance with the prospectuses for the Funds.  Had Kaplan disclosed that it was engaged in late trading or that they intended to engage in late trading, the Funds and MFS Fund Distributors would not have sold shares to Kaplan.

62.     In selling shares to Kaplan and redeeming shares for Kaplan, the Funds and MFS Fund Distributors relied on Kaplan's false representation that orders to purchase or sell such shares had been placed before the Valuation Time to determine the price applicable to each such transaction.  Had Kaplan disclosed that these orders were in fact placed after the Valuation Time, Plaintiffs would have processed these transactions at the price computed at the Valuation Time on the next business day, in accordance with Rule 22c-1.

63.     By reason of the foregoing violations of Section 10(b) and Rule 10b-5, the Funds and MFS Fund Distributors have suffered and will suffer substantial damages, including damage to their reputation, in an amount to be determined at trial.

15

## SECOND CAUSE OF ACTION
## FRAUD AND MISREPRESENTATION
### (All Plaintiffs)

64.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 63, above.

65.     As specifically set forth in Paragraph 55, in connection with its late trading activity, Kaplan made numerous false statements of material fact or omitted to state facts necessary under the circumstances to make its statements not misleading.  Kaplan knew, or through the exercise of reasonable diligence should have known, that these statements were false or misleading at the time that the statements were made.

66.     Kaplan intended that Plaintiffs and their affiliates would rely on its false and misleading statements by permitting Kaplan to buy and sell shares in the Funds and by issuing and redeeming shares in the funds at the previous day's public offering price.  As set forth in Paragraphs 61 and 62 and elsewhere in this Complaint, Plaintiffs did in fact rely on those statements.

67.     The Plaintiffs and their affiliates have suffered and will suffer substantial damages, including damage to their reputation,  in an amount to be determined at trial as a result of Kaplan's false and misleading representations.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### (All Plaintiffs)

68.    Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 67, above.

69.    Kaplan breached several of its representations and warranties and failed to comply with its obligations under the Dealer Agreement by, among other things, failing to comply with applicable federal securities laws regarding the purchase and sale of mutual fund shares (including § 22(d) of the Investment Company Act and Rule 22c-1 thereunder), and by purchasing and selling shares in the Funds at a price other than the public offering price.

70.    Plaintiffs and their affiliates have suffered and will continue to suffer losses as a result of these breaches.

a.    The Funds have suffered losses because (1) their net assets have been diminished, as set forth above and (2) they have incurred, and will continue to incur, attorneys' fees and other expenses in connection with this lawsuit and other legal proceedings related to Kaplan's late trading.

b.    MFS Fund Distributors has suffered losses incurred, and will continue to incur, attorneys' fees and other expenses in connection with this lawsuit and other legal proceedings related to Kaplan's late trading.

c.    MFS has suffered losses because (1) the SEC required it to disgorge $175 million, part of which represents compensation to the Funds for Kaplan's late trading, and (2) it has incurred, and will continue to incur, attorneys' fees and other expenses in

17

connection with this lawsuit and other legal proceedings related to Kaplan's late trading, including but not limited to the SEC investigation into MFS.

71.     Under the Dealer Agreement, Kaplan is obliged to indemnify and hold harmless MFS Fund Distributors, the Funds and their affiliates (including MFS), from and against the foregoing losses, or any similar future losses that may arise as they are incurred, to the extent that such losses relate in any way to Kaplan's breaches of its representations and warranties and failure to comply with its obligations under the Dealer Agreement.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF MASSACHUSETTS GENERAL LAWS ch. 93A**
**(All Plaintiffs)**

72.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 71, above.

73.     Each of the Plaintiffs and Kaplan is a "person who engages in the conduct of [a] trade or commerce" within the meaning of Massachusetts General Laws ch. 93A.

74.     Kaplan's late trading activities constitute "unfair or deceptive acts or practices" within the meaning of Massachusetts General Laws ch. 93A § 2.

75.     Kaplan's late trading was a willful or knowing violation of Massachusetts General Laws ch. 93A § 2.

76.     Kaplan's late trading activities caused the Plaintiffs and their affiliates to suffer the loss of money or property, as set forth in Paragraph 70 and elsewhere in this Complaint. These losses occurred and will occur in whole or in part in Massachusetts, where each of the Plaintiffs maintains its principal place of business.

77.     Accordingly, Plaintiffs are entitled to three times the actual damages caused by Kaplan's late trading, which will be established at trial, as well as the reasonable costs and attorneys' fees incurred in prosecuting this action.

**FIFTH CAUSE OF ACTION**
**CONVERSION**
**(Fund Plaintiffs)**

78.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 77, above.

79.     Because Kaplan was engaged in late trading, when it purchased shares in the Funds it received more shares than it was legally entitled to receive based on the dollar amounts that it invested.  The Funds had rightful possession of these shares.  Kaplan wrongfully exercised ownership, control, or dominion over these shares, even though it had no legal right of possession over them.

80.     Because Kaplan was engaged in late trading, it received more cash than it was legally entitled to receive when Kaplan sold shares in the Funds.  The Funds had rightful possession of these amounts of cash.  Kaplan wrongfully exercised ownership, control or dominion over these amounts of cash, even though it had no legal right of possession over them.

81.     As a result of the foregoing, the Funds have suffered and will suffer substantial damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Fund Plaintiffs)

82.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 81, above.

83.     Kaplan was unjustly enriched through its late trading in the Funds, because Kaplan purchased shares at less than their public offering price and sold shares at more than their public offering price.  By doing so, Kaplan earned a profit, at the expense of the Funds.  This amount constitutes unjust enrichment.

84.     Under these circumstances, equity requires that Kaplan disgorge its unjust enrichment and make restitution in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT,
## MASS. GEN. LAW CH. 110A § 410.
### (Funds and MFS Fund Distributors)

85.     Plaintiffs repeat and reallege each of the allegations in Paragraphs 1 through 84, above.

86.     In order to reap the profits of its late trades, Kaplan frequently purchased shares in the Funds and redeemed them on successive days.

87.     Such redemptions constituted an offer or sale of securities by Kaplan within the meaning of the Massachusetts Uniform Securities Act, Mass. Gen. Law Ch. 110A § 410.

88.     Such redemptions were made by means of untrue statements of material facts and omissions to state material facts necessary to make statements not misleading, in light of the circumstances under which they were made.

20

89.    Such redemptions were directed to the Funds and MFS Fund Distributors in Boston, Massachusetts, where they were received and acted upon.

90.    In redeeming Kaplan's shares, the Funds and MFS Fund Distributors reasonably relied on Kaplan's false and materially misleading representations.

91.    By making false or materially misleading statements in connection with the sale of shares in the Funds, Kaplan violated the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410.

92.    By reason of the foregoing violations of the Massachusetts Uniform Securities Act, the Funds and MFS Fund Distributors suffered and will suffer substantial damages, including damage to their reputation, in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against Kaplan, as follows:

A.    Awarding three times the actual compensatory damages to Plaintiffs, in an amount to be determined at trial;

B.    Ordering Kaplan to disgorge its unjust enrichment and make restitution to the Funds of any and all profits earned through late trading in the Funds;

C.    Awarding the Plaintiffs their costs and attorneys' fees in this action; and

D.    Awarding such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated:  November 15, 2005

Respectfully submitted,

/s/ Anita B. Bapooji
Anita B. Bapooji (BBO# 644657)
Goodwin | Procter LLP
Exchange Place
53 State Street
Boston, MA  02109
(617) 570-1000
(617) 523-1231 (fax)

**Counsel For All Plaintiffs**

William F. Sheehan
Michael K. Isenman
Tamra T. Moore
Goodwin | Procter LLP
901 New York Avenue NW
Washington, DC  20001
(202) 346-4000
(202) 346-4444 (fax)

**Of Counsel For All Plaintiffs**

John Donovan (BBO# 130950)
Jane Willis (BBO# 568024)
Carisa Klemeyer (BBO# 655045)
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7603 (phone)
(617) 951-7050 (fax)

**Counsel For MFS Series Trust II,
on behalf of its series MFS Emerging
Growth Fund, and
Massachusetts Investors Trust**